IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| HOWARD R. SPINDEL, | ) | |
| | ) | |
| Plaintiff, | ) | CV 06-969-HU |
| | ) | |
| v. | ) | |
| | ) | FINDINGS AND |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | RECOMMENDATION |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

KAREN STOLZBERG
11830 SW Kerr Parkway # 315
Lake Oswego, Or 97035

     Attorney for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

1 - FINDINGS AND RECOMMENDATION

RICHARD RODRIGUEZ
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Ste 2900 M/S 901
Seattle Washington 98104

      Attorneys for Defendant

HUBEL, Magistrate Judge:

## INTRODUCTION

      Plaintiff Howard Spindel brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act.   The court has jurisdiction under 42 U.S.C. § 405(g).   The Commissioner's decision should be affirmed.

## BACKGROUND

      Spindel was born on December 29, 1952.  He completed high school and four years of college.  He worked as a computer programmer and computer consultant.  In his Social Security disability report, Spindel alleged disability due to sleep apnea, narcolepsy, pinched neck nerves, partial deafness and depression.  Spindel stopped working on April 1, 2003, allegedly because he was physically unable to do it, was falling asleep on the job, could not lift, had poor concentration and could not type for extended periods.

## DISABILITY ANALYSIS

      The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

2 - FINDINGS AND RECOMMENDATION

impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. Spindel challenges the ALJ's findings at steps two and four of the decision-making process.

At step two, a claimant must show that he has any severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). If he cannot meet this *de minimis* burden, the Commissioner will find him "not disabled" without continuing to the remaining steps. 20 C.F.R. § 404.1520(c); Social Security Ruling (SSR) 85-28.

At step two of her decision, the ALJ found that Spindel had monosymptomatic narcolepsy, depression, anxiety, shoulder pain and tremor with poor fine motor dexterity in the dominant left hand and arm. The ALJ found that these impairments combine to significantly limit Spindel's ability to do basic work activities and are, therefore, severe within the meaning of the regulations.

Before reaching step four of the decision-making sequence, an ALJ must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545; SSR 96-8p.

In this case, the ALJ found that Spindel retained the RFC to perform a wide range of work at the medium level of exertion, with manipulative, environmental and vocational non-exeretional limitations, as follows: he should avoid overhead work and lifting while reaching to the sides or in front; he has mild to moderate impairment of fine motor speed and dexterity restricting him from

work requiring rapid, frequent or constantly repetitive fine dexterity; monosymptomatic narcolepsy precludes him from working around hazards, such as unprotected heights and machinery with exposed moving parts; he must avoid sitting and being inactive at work and should be exposed to stimulation in a dynamic environment with either physical activity or mental stimulation, while seated. He has no deficits in memory, learning, attention or concentration when in an adequately stimulating or dynamic environment. Accordingly, he has no limitations in his capacity to perform skilled work. Tr. 28-29, 422.[1]

At step four, an ALJ must determine whether the claimant retains the RFC to perform work he did in the past. If so, the claimant is not disabled and the ALJ need not continue to step five. 20 C.F.R. § 404.1520(f).

Here, the ALJ relied on the testimony of an impartial vocational expert who opined that Spindel's past relevant work as a computer programmer, software designer and analyst, systems analyst and consultant did not require work activities or functions precluded by his RFC. Accordingly, the ALJ concluded that Spindel retained the RFC to do his past relevant work and was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of record filed by the Commissioner. (Docket # 4).

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence and resolving ambiguities. *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson*, 359 F.3d at 1193. The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## DISCUSSION

Spindel contends the ALJ erred at step two by failing to specify adhesive capsulitis as a severe impairment within the meaning of the regulations. He contends the ALJ failed to assess his RFC accurately because he discredited Spindel's subjective statements and discounted the opinions of three physicians. Spindel asserts that the ALJ elicited testimony from the VE based on a vocational hypothetical question that did not accurately reflect all of his impairments.

### I.    Severe Impairments

At step two of the sequential evaluation, the claimant must show that he has any combination of impairments that significantly limits his ability to perform basic work activities. *Yuckert*, 482 U.S. 146. If he cannot meet this threshold burden, the Commissioner will find him "not disabled" without continuing to the remaining steps in the five-step decision-making sequence. 20 C.F.R. § 404.1520(c); SSR 85-28. It is a *de minimis* screening device to dispose of groundless claims. *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996).

Spindel contends the ALJ erred by failing to find adhesive capsulitis a discrete severe impairment.  At step two, the task is not to identify each individual impairment that would independently satisfy the *de minimis* severity screening.  The question is whether any combination of impairments have more than minimal impact on his ability to do basic work activities.

Spindel's argument fails to show an error at step two because the ALJ did not deny his claim at that step.  The ALJ found that he surmounted the *de minimis* severity screening by showing that his combined impairments limit his ability to perform basic work activities.  The ALJ properly continued to the remaining steps of the sequential decision-making process.

After a claimant has survived step two, the ALJ must consider the functional limitations from all his medically determinable impairments, including any that the ALJ did not identify as severe at step two, in the remaining steps of the decision-making process.  20 C.F.R. § 404.1523.  Accordingly, the more appropriate issue Spindel might have raised is whether the ALJ properly considered the evidence of functional limitations attributable to adhesive capsulitis in her RFC assessment and at step four.  The court is satisfied that she did.

Contemporaneous medical records from the time Spindel stopped working do not reflect any indication that he experienced the left-sided shoulder pain and stiffness that was eventually diagnosed as adhesive capsulitis.  Spindel complained of right-sided neck pain radiating to the right shoulder blade in July 2003.  In August he described mild right-sided upper shoulder pain that did not radiate down his arm and did not disturb his sleep.  On physical examination, Spindel's shoulder was "normal." Tr. 245.  He had a forward-head posture and mild radicular cervical symptoms.

He continued to have intermittent right shoulder pain that was "very occasional" and was associated "with certain motions" such as twisting.  Tr. 243, 244.  During a short course of physical

therapy he learned better posture and improved his cervical range of motion. He later reported that he discontinued physical therapy due to increased neck pain. He did not mention right-sided neck pain in later medical appointments.

In June 2004, Spindel began to complain of low-level pain in the left shoulder with associated pain and numbness in the hands. Spindel told his primary care physician, Scott Dunlap, M.D., that he "would never be able to work as a computer programmer or other job." Tr. 231. On examination, however, Spindel had good symmetrical grip strength and Dr. Dunlap did not indicate functional deficits or range of motion limitations.

An MRI study of the cervical spine in July 2004 and an electromyograph examination of the left shoulder in September 2004 revealed no evidence of radiculopathy or plexopathy to explain Spindel's left shoulder complaints. On September 1, 2004, Lane Barton, M.D., examined Spindel and noted that he had lost some motion in the left shoulder. He diagnosed adhesive capsulitis and sent Spindel back to physical therapy. Spindel began a narcotic pain medication regimen.

At about the same time, Spindel underwent neuropsychological testing by Ronald Sandoval, Ph.D. His results were almost completely consistent with expectations for his age, level of education, and superior intellectual ability. The only significant exception was a "mild to moderate impairment in fine-motor speed and dexterity." Tr. 296-97. The etiology of this fine motor impairment is not clear from the record. The ALJ found that it was "secondary to left (dominant) shoulder pain." Tr. 29. Dr. Barton suggested mild slowing of motor conduction consistent with diabetic peripheral neuropathy. Tr. 222, 262-63. Spindel reported that it was a congenital tremor he had experienced since early adulthood. Tr. 292.

7 - FINDINGS AND RECOMMENDATION

In December 2004, Spindel reported that pain medications were controlling his shoulder pain. Tr. 221. In March 2005, he was able to move the shoulder in a fairly good range of motion without apparent pain. Tr. 212-13. By July 2005 Spindel was completely off narcotic medications and reported that his left shoulder was not bad. Tr. 303.

In September 2005, Spindel had only a slight limitation in range of motion in the left shoulder with only occasional discomfort. He reported a recent onset of pain in the right shoulder. This did not require treatment, but Spindel wanted the complaint recorded to support his social security claim. Tr. 302.

The claimant has the burden of proving any limitations in his ability to do basic work activities. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). The medical evidence demonstrates that Spindel had low-level pain in the left shoulder in June 2004 and developed range of motion restrictions in September 2004 when Dr. Barton diagnosed adhesive capsulitis. By December 2004, Spindel's shoulder pain was controlled by medication and by March 2005, Spindel had recovered fairly good range of motion.

The ALJ's RFC assessment reasonably reflects the impairments demonstrated by the evidence, by restricting Spindel from overhead work and work requiring him to lift while reaching. The ALJ could reasonably conclude that Spindel's adhesive capsulitis of the left shoulder did not involve greater ongoing functional limitations. Although Spindel complained of low-level pain and intermittent discomfort for a somewhat longer period, he had significant range of motion restrictions for a relatively brief time, far short of the 12-month duration requirement under the Social Security Act.

Spindel argues that the ALJ rejected the diagnosis of adhesive capsulitis by placing quotation marks around the term "which intimates that the doctor's use of the term is suspicious or even ridiculous." Pl. Br. 29. The ALJ used quotation marks liberally in her decision, but there is no basis to conclude that by doing so she intended anything more than to quote the medical records, regulations and other source documents from which the quotations were taken.

Moreover, establishing an impairment requires findings of functional limitations. A diagnosis without significant functional limitations has no vocational significance and the fact that a condition has been acknowledged with a medical diagnosis does not establish functional limitations. *See Key v. Heckler,* 754 F.2d 1545, 1549-1050 (9th Cir. 1985); *Young v. Sullivan,* 911 F.2d 180, 183-184 (9th Cir. 1990). Accordingly, regardless of whether the ALJ accepted the label of "adhesive capsulitis" she adequately considered the evidence of functional limitations and reflected reasonable conclusions from that evidence in her RFC assessment.

Spindel also objects to the ALJ's description of his limitation in dexterity as follows: "tremor with poor fine motor dexterity of the dominant left hand/arm, secondary to shoulder pain." Tr. 30. Spindel believes this statement erroneously suggests that his tremor causes his shoulder and arm pain. The court finds no basis for this objection because the plain meaning of the quoted statement is that the tremor results from the shoulder pain and not the reverse.

The court acknowledges conflicting evidence regarding the possible connection between Spindel's shoulder pain and his fine motor limitations. This connection can be traced to Spindel's own subjective reports to Drs. Dunlap and Barton describing neck and shoulder pain with associated hand pain and numbness. Tr. 182, 264. As noted previously, however, Spindel also reported that

the tremor was a congenital condition he had lived with for many years and Dr. Barton attributed Spindel's mild fine motor limitation to diabetic peripheral neuropathy.  Tr. 222, 262-63, 292.

It is unnecessary to determine whether Spindel's mild limitation in fine manipulation derives from his shoulder discomfort or from diabetic peripheral neuropathy or from a congenital condition. The ALJ accounted for Spindel's functional limitation in fine manipulation and concluded that he could not perform work requiring frequent or constantly repetitive fine dexterity.  The ALJ included this limitation in her RFC assessment and in the hypothetical question used to elicit testimony from the vocational expert.  Accordingly, any error in the ALJ's determination of the underlying cause of the fine motor limitation has no consequence.

In summary, the ALJ's description of Spindel's functional limitations from adhesive capsulitis of the left shoulder was sufficient.  Her assessment of Spindel's shoulder limitations and mild to moderate limitations in fine motor dexterity is supported by a reasonable interpretation of the evidence and should not be disturbed.  *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40.

## II.    RFC Assessment

Spindel contends the ALJ failed to assess his RFC accurately because he discredited Spindel's subjective statements and rejected the opinions of Drs. Dunlap and Sandoval and the post hearing letter of Stuart Oken, M.D.

### A.    Spindel's Subjective Statements

Spindel testified that he has multiple interacting problems that prevent him from working. The worst is sleep difficulty, which causes daytime drowsiness, lack of energy and difficulty concentrating.  Tr. 392.  The next most debilitating problem is left shoulder pain, initially thought to be a recurrence of cervical nerve impingement, but eventually diagnosed as adhesive capsulitis.

Spindel admitted that this problem has resolved.  Tr. 393.  The third major problem is depression.

Spindel did not recognize that he had depression and declined treatment until January 2005.  He now

takes antidepressant medications.  Tr. 394-95.  Spindel also has type-two diabetes mellitus, which

has been well controlled at all relevant times.  Tr. 397.

Spindel testified that he stopped working because he was falling asleep at the office for at

least two hours a day and having difficulty lifting equipment because of pain in his shoulder.  Tr.

405.  He had overwhelming insomnia for a few months.  Tr. 406.  He now takes Seroquel, a sleep

medication, which gives him a hangover effect exacerbating his regular lethargy and daytime

drowsiness.

The ALJ accepted that Spindel is impaired by sleep disorders, depression, anxiety, left hand

tremor with poor fine motor dexterity and shoulder pain.  The ALJ did not accept Spindel's assertion

that these conditions impair him so severely that he cannot perform his past work.

An ALJ must provide clear and convincing reasons for discrediting a claimant's testimony

regarding the severity of his symptoms.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).  *See

also Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir. 1996).  The ALJ must make findings that are

"sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily

discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

When making a credibility evaluation, the ALJ may consider objective medical evidence and

the claimant's treatment history as well as any unexplained failure to seek treatment or follow a

prescribed course of treatment.  *Smolen*, 80 F3d at 1284.  The ALJ may also consider the claimant's

daily activities, work record and the observations of physicians and third parties in a position to have

personal knowledge about the claimant's functional limitations.  *Id.*  In addition, the ALJ may

employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p.

The ALJ considered appropriate factors in evaluating Spindel's credibility. The ALJ considered the objective medical evidence and Spindel's treatment history which did not fully support his reported symptoms. For example, Spindel claimed adhesive capsulitis caused left shoulder pain beginning in March 2003. His reports to physicians at that time, however, related to cervical pain in his neck radiating to his right shoulder blade and the right side of his head. The ALJ could reasonably conclude that this right-sided pain in the neck, head and shoulder blade was distinct from his later problem with adhesive capsulitis in the left shoulder joint, which developed from June to September 2004.

Indeed, although Spindel alleges disability beginning in April 2003, his medical records up to that time reflect only routine diabetes check-ups. He did not report significant left-sided shoulder pain until June 2004. Tr. 182. He reported the insidious onset of daytime drowsiness in February 2004. He described the drowsiness as severe when sedentary, but only occasional when busy or interactive. He had no problems with driving or sudden sleep attacks. Tr. 153-55. The ALJ could reasonably conclude from this treatment history that Spindel was not experiencing any of the impairments he now claims to be disabling at the time he stopped working.

Similarly, Spindel self-reported memory problems, concern for early dementia, loss of cognitive acuity and difficulty with concentration. Tr. 179, 292. Contrary to these assertions, Dr. Sandoval obtained test results showing that Spindel had superior intellectual ability, including

12 - FINDINGS AND RECOMMENDATION

memory and learning, concentration, attention, executive function, visual scanning and tracking speed and language function. Tr. 296-97.

Spindel testified that he stopped working due in part to difficulty lifting computer equipment. Three months after he allegedly stopped working, however, he told Dr. Dunlap that he could not continue his job due to low energy, excessive sleep and difficulty getting going. He did not mention difficulty lifting and had no arm weakness. Tr. 246.

Spindel now argues that limitations in motor dexterity would preclude such activities as working on a computer. Inconsistently with his current claim, however, Spindel told Dr. Sandoval in August 2004, that this was a benign familial tremor that he has had since the age of 21. Tr. 292. Notably, this mild impairment did not preclude Spindel from working many years as a computer programmer and consultant.

The ALJ noted that Spindel's treatment history reflected a relative lack of interest in pursuing treatment. For example, when his sleep laboratory results indicated obstructive sleep apnea, Spindel declined to undergo a trial with a continuous positive airway pressure (CPAP) device. At the hearing, Spindel asserted that he could not wear the CPAP mask due to shoulder pain. Tr. 396-97. This is not consistent with the medical records showing that Spindel began to complain of left shoulder pain several months after the sleep study. It leaves unexplained why Spindel failed to mention shoulder pain when he declined to try the CPAP in April 2004. Tr. 149, 274. In any event, the ALJ could reasonably conclude that a person experiencing a debilitating sleep disorder would at least try an effective treatment method recommended by his physician.

Similarly, Dr. Sandoval recommended therapy and treatment with antidepressant medications. Spindel had no interest in psychotherapy. He admitted that he had received benefit

from antidepressant medications in the past, but was not interested when it was recommended by Dr. Sandoval. Tr. 252, 298. At the hearing, Spindel testified that he did not recognize that he had depression when he declined treatment and that he feared sexual side effects of antidepressant medication, due to bad experiences in the past.

The ALJ could reasonably conclude that if Spindel had been suffering from severe depression symptoms as he now claims, he would have been willing to try recommended treatments. His failure to recognize his depression reasonably casts some doubt on the severity of the symptoms. This is particularly true given Spindel's history of beneficial treatment with antidepressants.

Further doubt arises because Spindel did not exhibit any change in depression symptoms during the relevant time. Dr. Dunlap assessed Spindel's mood and affect at regular diabetes check-ups. Dr. Dunlap often noted that Spindel appeared somewhat depressed, but always indicated that this was usual for Spindel. Accordingly, there was no increase in the severity of Spindel's depression symptoms to correlate with his inability to continue working in April 2003.

The ALJ noted evidence that Spindel exaggerated his symptoms. For example, Spindel told Dr. Sandoval he "typically is able to function well for approximately one hour per day" yet he was able to function well for the entire 4-hour psychometric testing period. Tr. 297. Reports of his activities are also inconsistent with a limitation to one hour of adequate functionality. In addition, Spindel produced a personality profile indicating "that he may have exaggerated his symptoms to some extent." Tr. 296.

Similarly, the record suggests that Spindel exaggerated the impact of diabetes to Gregory Clark, M.D., his sleep consultant. Dr. Clark noted that Spindel "indicated at the time of initial consultation that he was disabled because of his diabetes." Tr. 274. Spindel now denies making this

report to Dr. Clark and admits that his diabetes has been well controlled at all relevant times.  The ALJ could reasonably conclude that Dr. Clark accurately recorded his patient's subjective report.

The ALJ found Spindel's reported daily activities inconsistent with the severity of limitation he claimed.  Spindel prepares meals, checks the stock market on the computer, does record-keeping for investments, looks for collectible coins on Ebay, walks to the post office and back, peruses his coin collection, watches television for a couple of hours or more, writes correspondence and takes his girlfriend to dinner once a week.  He has no difficulty driving despite his assertion of debilitating drowsiness and inability to concentrate.  He does not experience sleep attacks despite his presumed narcolepsy diagnosis.

While the foregoing activities are not equivalent to full time employment, they are inconsistent with Spindel's assertion that he can function for only one hour a day.  The ALJ could reasonably conclude that they reflect adversely on Spindel's credibility.

The court acknowledges that one of the ALJ's reasons for discrediting Spindel was erroneous.  The ALJ believed that the treatment record did not support Spindel's assertion that he tried prescription stimulants to treat his daytime drowsiness.  Tr. 27.  In fact, Dr. Clark prescribed Ritalin in April 2004.  Tr. 149-50.  Spindel self-discontinued it after a few doses, reportedly due to headaches and paranoia.  Tr. 179.   Dr. Clark then changed the prescription to Provigil, which Spindel discontinued reportedly after experiencing increased insomnia.  Tr. 252.  It is unclear from the record whether Dr. Clark considered these trials adequate or if there are alternate stimulants available for this condition.

Despite the ALJ's failure to recognize the foregoing stimulant trials, her interpretation of the record as a whole supports the credibility determination she reached.  The ALJ considered proper

15 - FINDINGS AND RECOMMENDATION

factors and her credibility determination is supported by substantial evidence in the record as a whole, including the objective and clinical medical evidence, treatment history, work history and reported daily activities. These factors permitted the ALJ to draw an adverse inference regarding the credibility of Spindel's subjective statements about the severity of his limitations. *Smolen*, 80 F.3d at 1284.

The ALJ's interpretation of the evidence is reasonable and provides an adequate basis for discounting Spindel's assertion that his symptoms are so severe that he cannot perform his past work or any other work. Her findings are sufficiently specific to permit this court to conclude that she did not discredit Spindel's testimony arbitrarily. *Orteza v. Shalala*, 50 F.3d at 750.

## B.    Dr. Dunlap's Opinion

Dr. Dunlap was Spindel's primary care physician beginning in 2000. In his treatment notes preceding Spindel's alleged onset of disability in April 2003, he recorded regular diabetes check-ups, treatment for psoriasis, a consultation regarding sun protection, treatment for a mole and a wart and other routine care. On March 18, 2003, Spindel first told Dr. Dunlap that he was "sleepy a lot." Tr. 248. He denied having sudden episodes such as falling asleep at the wheel.

On July 22, 2003, Spindel asked Dr. Dunlap about disability and said that he felt he could not continue his job, due to "low energy, sleeping a lot, hard to get going." Tr. 246. He denied any increase in depression symptoms and, although Dr. Dunlap thought he appeared "possibly somewhat depressed," this was not a change from Spindel's usual appearance. Tr. 246. As previously noted, Spindel mentioned right-sided neck pain, which was similar to cervical pain he had experienced in the past, but milder. He had no weakness in the arms.

In August 2003, Spindel reported intermittent right-sided neck pain and stiffness with milder pain on the left.  Tr. 245-46.  After a short course of physical therapy he learned posture changes and had improved bilateral neck rotation with mild discomfort on the right and no reported discomfort on the left.  Tr. 241.

On October 3, 2003, Dr. Dunlap wrote a temporary disability letter to Spindel's insurance provider stating that Spindel's "medical condition is preventing him from performing the job duties of computer programmer."  Tr. 267.  Dr. Dunlap did not identify the medical condition or specify the work activities Spindel could not perform.  He opined that Spindel would be able to return to work as a computer programmer "if and when his severe fatigue improves."  Tr. 267.

In November 2003, Spindel reported that his neck was getting better, but that his sleepiness and daytime lethargy were worse.  He denied depression and had his usual affect.  He was alert.  Spindel told Dr. Dunlap he did not feel he could possibly return to his job and asked for a disability letter relating back to March 2003.  Dr. Dunlap agreed to provide the letter. Tr. 238-40.

In March 2004 Dr. Dunlap saw Spindel for a routine diabetes follow-up and discussed his low energy, blood sugars, blood pressure, lipid level and two small warts.  Spindel did not mention shoulder pain, any other pain or depression symptoms.  Tr. 237.  Spindel first told Dr. Dunlap of low-level left shoulder pain with low-level bilateral hand pain in June 2004, over a year after he stopped working.  He stated that with these limitations, he "would never be able to work as a computer programmer or other job."  Tr. 231.  Objectively, Spindel had good, symmetrical grip strength.

When Dr. Dunlap next saw Spindel in September 2004, Spindel said his left shoulder pain had worsened recently.  On examination, Spindel's shoulder motion was limited by pain.  Tr. 227.

Spindel began an opiate pain medication regimen and in October 2004, told Dr. Dunlap that the severe pain was controlled. He continued to have frequent low-level pain. In addition, he admitted feeling depressed. Dr. Dunlap observed that Spindel appeared moderately depressed as was usual for him. Tr. 224.

In December 2004, Spindel reported the onset of insomnia. This differed from his earlier complaint which was that he felt drowsy during the day despite sleeping all night. His new problem was difficulty falling asleep and waking during the night due to anxiety. Spindel said his shoulder pain was controlled pretty well by medication and reported an increase in range of motion. Tr. 221.

Dr. Dunlap next saw Spindel in March 2005 for a diabetes follow-up. Spindel reported that a sleep medication was helping with insomnia and that his shoulder was improving. Spindel reported that he remained severely depressed and able to concentrate for no more than an hour at a time. On examination, Spindel was able to move his shoulder in a good range of motion without apparent pain. Tr. 212-13.

Dr. Dunlap next saw Spindel for a diabetes follow-up in July 2005. Spindel reported that he was using a CPAP mask regularly on a trial basis, but felt worse. His left shoulder was not bad and he was completely off narcotic pain medication. He had a recent onset of discomfort in the right shoulder. He still felt depressed. Aside from Spindel's subjective reports, Dr. Dunlap did not record objective or clinical findings. Tr. 303-04.

In an undated letter, apparently written in preparation for the ALJ hearing in November 2005, Dr. Dunlap opined that Spindel "has been and continues to be disabled from work due to the combined effects of diabetes, adhesive capsulitis, narcolepsy, obstructive sleep apnea, idiopathic hypersomnia and insomnia. Tr. 368.

18 - FINDINGS AND RECOMMENDATION

Generally, a treating physician's opinion is given great weight in disability cases. *Ramirez v. Shalala*, 8 F.3d 1449, 1453 (9th Cir. 1993). The ALJ gave Dr. Dunlap's letter no weight in her decision.

The question of whether a claimant is employable is not a medical opinion about specific functional limitations, but an administrative finding that the regulations reserve to the Commissioner. Such an opinion cannot be given controlling weight or special significance, even when offered by a treating physician. 20 C.F.R. § 404.1527(e); SSR 96-5p. Dr. Dunlap's opinion that Spindel was disabled from work is not a medical opinion about specific functional limitations. He did not identify specific work related activities that Spindel could not perform. He simply stated generally that Spindel cannot work. The ALJ may not attribute any special significance to such an opinion, even though Dr. Dunlap is Spindel's treating physician.

A medical opinion can be controlling only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other evidence of record. 20 C.F.R. § 404.1527(d)(2). The ALJ found Dr. Dunlap's letter conclusory, unsupported by clinical findings and inconsistent with his own treatment records and those of other physicians.

Dr. Dunlap's progress notes do not reflect objective or clinical medical findings supporting Spindel's allegedly disabling impairments. The treatment notes reflect well controlled diabetes and clinical observations supporting mild to moderate depression. They reflect Spindel's subjective assertion of drowsiness and lethargy, but Dr. Dunlap typically found Spindel alert. Dr. Dunlap accepted Spindel's subjective description of his limitations from adhesive capsulitis, while his own findings indicated that Spindel had limitations in motion for a only a few months.

Notably the person having primary responsibility for treating Spindel's sleep disorders did not opine that they were disabling. Dr. Clark believed his sleep disorders were treatable with a CPAP device and palliative medications. Tr. 274-75. Spindel has had difficulty complying with these recommended treatments and the parties differ on the sincerity of his efforts. There is no dispute, however, that Dr. Clark did not find specific work related functional limitations and did not opine that the sleep disorders were disabling.

Similarly, the person primarily responsible for treating Spindel's adhesive capsulitis did not identify specific work functions he could not perform or opine that he was disabled. Dr. Barton found Spindel's range of motion limited by his subjective assertions of pain. The ALJ accepted that this limitation would exclude some occupations, but did not accept that it would preclude Spindel's past work. This is entirely consistent with Dr. Barton's treatment records.

Despite the absence of clinical findings of his own or objective findings supporting disability by Drs. Clark and Barton, Dr. Dunlap agreed to write disability letters on Spindel's behalf dating back to March 2003. The ALJ could reasonably conclude that Dr. Dunlap based his disability opinion primarily on Spindel's subjective statements. An ALJ can properly reject a physician's disability opinion that is premised on the claimant's own subjective complaint of disabling symptoms which the ALJ has properly discounted. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

The ALJ made findings setting forth specific, legitimate reasons for discounting Dr. Dunlap's disability opinion. Her reasoning is supported by substantial evidence in the record as a whole, and should not be disturbed. *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

On April 24, 2006, Dr. Dunlap wrote a post-hearing letter to Spindel's attorney regarding several points of disagreement with the ALJ's findings.  Tr. 378-79.  This letter was not before the ALJ, but was presented first in Spindel's request for review before the Appeals Council.  When the Appeals Council considers materials not seen by the ALJ and concludes that the materials provide no basis for review of the ALJ's decision, a reviewing court may consider the additional materials in its determination whether there is substantial evidence supporting the Commissioner's decision. *Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir.), *cert. denied*, 121 S. Ct. 628 (2000).  *See also Ramirez v. Shalala*, 8 F.3d 1449, 1451-52 (9th Cir. 1993).

Dr. Dunlap's letter does not undermine the evidentiary basis of the ALJ's decision.  He indicated that the ALJ incorrectly implied a causative relationship between Spindel's narcolepsy and sleep apnea, which are actually two distinct problems.  There is no assertion that the ALJ failed to consider the functional limitations attributable to the sleep disorders.  Accordingly, any error was harmless.

Dr. Dunlap disagreed with the ALJ's assertion that Spindel claimed he was disabled by diabetes.  This statement can be traced to Spindel himself, however.  Dr. Clark indicated that Spindel told him he was disabled by diabetes.  Tr. 274-75.  As noted previously, the ALJ could reasonably believe Dr. Clark's recollection of Spindel's subjective statements.

Dr. Dunlap objected to the ALJ's suggestion that treatment with chronic narcotic medications would be contraindicated in a patient with narcolepsy due to "clinically proven side-effects of drowsiness and decreasing alertness." Tr. 24.  This court agrees that it is beyond the role and expertise of the ALJ to make independent medical findings based on generally accepted medical views that are not in evidence.  *See* SSR 96-2p.  Disregarding this statement of the ALJ, however,

does not reduce the validity of the remaining reasons she gave for discounting Dr. Dunlap's disability opinion.

Similarly, Dr. Dunlap pointed out that the ALJ misread the treatment notes from August 1, 2005. Tr. 25, 379. The ALJ believed Spindel reported feeling better after trying a CPAP device regularly for several weeks. In fact, Spindel said he felt no better using the CPAP, although he tolerated the mask and pressure well. Tr. 313. This error does not invalidate the ALJ's reasons for discounting Dr. Dunlap's disability opinion.

Finally, Dr. Dunlap asserted that Spindel's noncompliance with recommended medications for depression was reasonable due to bad experiences and side effects. This reasoning is acceptable to a point; it does not explain Spindel's failure to report symptoms until long after he stopped working or his unwillingness to try treatments such as psychotherapy or medications with which he had no experience. Accordingly, it does not undermine the evidentiary basis for the ALJ's decision to discount Dunlap's disability opinion.

### C.    Dr. Oken's Opinion

Psychiatrist Stuart Oken, M.D., treated Spindel for depression in the distant past, ending in 1993. He then evaluated Spindel in January 2005. Spindel said he felt only mildly depressed and knew what depression felt like from his earlier experience. Tr. 220. Two weeks after starting a sleep medication (Seroquel) and an antidepressant (Remeron), Spindel reported sleeping better and Dr. Oken found him euthymic. Tr. 217.

In February 2005, Spindel reported the sleep problem resolved, but his mood and affect became depressed again. Dr. Oken increased the dosage of Remeron, but Spindel remained

depressed, manifested primarily as irritability. Dr. Oken then prescribed an additional antidepressant (Effexor).  Tr. 214.

In April 2005, Spindel reported that he had discontinued Effexor, but did not elaborate on the reason for this.  Dr. Oken recommended an herbal supplement and told Spindel that there were a number of other antidepressants to try, as well as therapy.  Spindel was not interested in therapy. Dr. Oken observed that Spindel appeared moderately depressed.  Tr. 210.

In May 2005, Spindel told Dr. Oken that his mood had improved until he had a bout of insomnia.  Dr. Oken found him slightly depressed.  Spindel continued to take Remeron and Dr. Oken discussed other possible medications.  Tr. 305.  One month later, Dr. Oken observed that Spindel remained slightly depressed and Spindel reported feeling somewhat better.  Tr. 304.  In August Spindel continued to report improvement in mood and affect although he still did not feel great.  Dr. Oken assessed his mood as slightly depressed.  Spindel added a new antidepressant called Duloxetine to his regimen.  Tr. 303.  In September Spindel was experiencing grief over the death of a friend.  Tr. 302.  In October he remained depressed.  Tr. 301.

Dr. Oken wrote two post-hearing letters in response to the ALJ's findings.  The two letters were not before the ALJ.  The Appeals Council considered them and concluded that they did not present a basis for reviewing the ALJ's decision.  Accordingly, this court may consider the letters to determine whether the substantial evidence in the record as a whole supports the Commissioner's decision.  *Harman v. Apfel*, 211 F.3d at 1180; *Ramirez v. Shalala*, 8 F.3d at 1451-52.

In the first letter, dated April 11, 2006, Dr. Oken wrote to Spindel's attorney that Spindel had lifelong dysthymia which develops into major depression under stressful situations.  Tr. 377.  This statement is consistent with the record as a whole, which reflects that Spindel has exhibited a mild

to moderate degree of depression at all relevant times.  This did not preclude him from working in the past and there is no indication of a sudden increase in symptoms at the time he stopped working. In fact, Spindel denied such a change and admitted that he would know from his past experience if he were having depression.

The ALJ accommodated the likelihood that stressful situations would increase Spindel's symptoms of depression by limiting his occupational base to jobs in which he could avoid moderate and extreme levels of psychological stress. Tr. 422.  Accordingly, Dr. Oken's letter of April 11, 2006, did not undermine the evidentiary basis of the ALJ's decision.

In the second letter, dated April 25, 2006, Dr. Oken disagreed with the ALJ's conclusion that Spindel had been uncooperative with treatment recommendations.  This is a matter that goes to Spindel's credibility and has been discussed previously in that context.

Dr. Oken also agreed with Dr. Dunlap's assessment that Spindel "has been and continues to be disabled from work as a result of the combined effects" of his multiple medical conditions.  Tr. 380. As also discussed previously, whether Spindel is "disabled from work" is not a medical opinion about specific functional limitations, but an administrative finding reserved to the Commissioner. It does not establish the presence of additional functional limitations the ALJ should have included in her RFC assessment.  Accordingly, it does not undermine the evidentiary basis of the ALJ's decision.

### D.    Dr. Sandoval's Opinion

Dr. Sandoval performed a neuropsychological evaluation after Spindel self-reported memory problems and concerns for early dementia to Dr. Clark.  Spindel told Dr. Sandoval he was disabled by sleep apnea, narcolepsy and nerve pain.  He reported a dramatic change in mental function,

limiting his functional ability to one hour per day, compared to his prior functioning as one of the top people in the computer field.

Clinically, Spindel was on time, cooperative, gave good effort, maintained attention and completed tasks without coaxing. On testing, his overall cognitive ability was in the superior range, which was consistent with his premorbid level of functioning. His memory and learning, attention, concentration, executive functioning, visual scanning, tracking speed and language function were all intact. Tr. 296-97.

Dr. Sandoval found what appeared to be a clinically significant level of depression with anxiety and stress. Tr. 297. He recommended psychotherapy and treatment with antidepressant medications. Spindel did not acknowledge symptoms of depression and was not particularly interested in either therapy or medication, although he had received benefit from antidepressants in the past. Tr. 298.

Dr. Sandoval diagnosed "major depressive disorder (probable, versus dysthymic disorder)" and assigned a global assessment of functioning (GAF) of 50. Tr. 297. Spindel argues that the ALJ erroneously failed to defer to Dr. Sandoval's diagnosis and GAF in her RFC assessment.

Spindel's argument cannot be sustained. There is no basis in the ALJ's decision to conclude that she did not fully credit Dr. Sandoval's diagnosis and GAF. Moreover, neither a diagnosis nor a GAF score identifies specific work-related limitations to be included in an RFC assessment. Dr. Sandoval's diagnosis is reflected in the ALJ's inclusion of depression and anxiety among the medically determinable severe impairments she specified at step two. Tr. 30. His diagnosis does not specify work-related limitations to be included in an RFC assessment.

25 - FINDINGS AND RECOMMENDATION

The GAF scale is used to reflect a clinician's opinion of the patient's overall level of functioning on a scale of 1 to 100. AMERICAN PSYCHIATRIC ASSOCIATION, *Diagnostic and Statistica Manual of Mental Disorders* (4th ed. Text Revision 2000) (DSM-IV-TR) 32-34. A GAF between 41 and 50 is appropriate when the patient has serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV-TR 34. Dr. Sandoval's GAF of 50 referred to his then-current condition at the time of the assessment.

The GAF scale does not identify specific work-related limitations that can be included in an RFC assessment, because it reflects the patient's overall level of functioning. In addition, it is specific to a point in time and does not reflect the patient's functioning over a 12-month period as required for an RFC assessment.

The ALJ asked the VE to identify only jobs in which a hypothetical worker could avoid moderate and extreme levels of psychological stress. Tr. 422. This adequately reflects Dr. Sandoval's finding that Spindel appeared to have "depression with anxiety and stress." Tr. 297. Dr. Sandoval's opinion did not identify any additional work-related restrictions and Spindel does not assert any.

Accordingly, the ALJ's RFC assessment reflects reasonable conclusions that can be drawn from Dr. Sandoval's report. The ALJ's interpretation is rational and should not be disturbed. *Batson*, 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40.

### III.    Vocational Evidence

Spindel's final contention is that the ALJ elicited testimony from the vocational expert with a hypothetical question that did not reflect all of his functional limitations. This contention cannot be sustained because the ALJ's hypothetical question included all the limitations she found to be

supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005). The ALJ is not bound to include limitations that are not supported by the record. *Id; Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001).

The ALJ properly evaluated all the medical evidence and Spindel's testimony. She drew reasonable conclusions from that evidence in reaching her RFC assessment. She elicited vocational testimony based on the limitations supported by the evidence. Accordingly, her exclusion additional limitations from her hypothetical question was proper.

### **Recommendation**

The ALJ applied proper legal standards and his conclusions are supported by substantial evidence. The Commissioner's final decision should be affirmed and the case should be dismissed.

### **Scheduling Order**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due May 16, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due May 30, 2007, and the review of the Findings and Recommendation will go under advisement on that date.

_____
Dennis James Hubel
UNITED STATES MAGISTRATE JUDGE